**UNITED STATES of America,**
**Appellee.**

v.

**Alfonso TARRICONE and Charles Di-**
**Canio, Defendants-Appellants.**

**No. 264, Docket 24107.**

United States Court of Appeals
Second Circuit.

Argued March 6, 1957.

Decided April 4, 1957.

Angelo A. Tumminelli, New York City, for defendants-appellants.

Leonard P. Moore, U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y. (Cornelius W. Wickersham, Jr., Chief Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before MEDINA and WATERMAN, Circuit Judges, and GALSTON, District Judge.

MEDINA, Circuit Judge.

On April 11, 1955, John Joseph Becker made an unsuccessful attempt to rob a branch of the Manufacturers Trust Company at 799 Blake Avenue in Brooklyn, New York, a member of the Federal Reserve System, whose deposits were insured by The Federal Deposit Insurance Corporation. It was a carefully planned affair and Becker had various confederates, each of whom played a significant role in the planning and execution of the abortive robbery. In due course Becker,

Michael Castello, Alfonso Tarricone, Charles DiCanio, Henry Caron and Patricia D. Castello, the wife of Michael, were indicted: for conspiracy to rob the bank, in violation of the general conspiracy statute, in Count One; for attempt to rob the bank, in violation of 18 U.S.C. § 2113(a), in Count Two; and for putting the life of one of the tellers of the bank in jeopardy by the use of a loaded revolver, in the course of the attempt to rob the bank, in violation of 18 U.S.C. § 2113(d).

Becker pleaded guilty to the first two counts of the charge and became the principal witness for the Government in the trial of Tarricone, DiCanio and Caron, which resulted in the judgments of conviction from which Tarricone and DiCanio now appeal. For some reason the appeal of Caron has not yet been perfected and it will be heard and determined later. Michael Castello was granted a severance on motion of the Government; Patricia pleaded guilty to the conspiracy charge, testified as a witness for the prosecution against Tarricone, DiCanio and Caron, and was thereafter permitted to withdraw her plea of guilty and substitute a plea of not guilty. Tarricone and Caron testified in their own defense; DiCanio did not.

Appellants claim that the proofs were insufficient to support the verdict and that they were deprived of a fair trial by reason of the refusal to give certain instructions to the jury in the form submitted to the trial judge and by reason of the reception of certain allegedly inadmissible testimony.

Becker's description of the crime was complete in every detail. He met Caron on March 21, 1955, and it developed that Caron was in with a group "pulling holdups" and that there was a chance they would let Becker "get in with them." There were some further meetings at an ice cream parlor at Pitkin and Van Siclen Avenues.

The scene then shifts to Castello's apartment at 1220 Sutter Avenue, not far from the bank where the attempted robbery took place.

There were at least two occasions, according to Becker, when all five of the conspirators gathered together at the Castello apartment, and in the same room. The first of these was early in April and the second on April 8. The upshot of the discussions was that Castello was to provide the revolvers and ammunition and the use of his 1949 Chevrolet. Caron owned a 1947 panel truck and this was placed at the disposal of the group. The plan was to scout the area in the neighborhood, which the robbers called "casing" the bank; they were to steal an automobile in which Caron was to drive Becker to the bank and in which they were to escape with the loot. This was referred to in Becker's testimony as the "getaway" car. Caron's panel truck was to be parked some little distance from the scene of the robbery. This Becker called the "switch" car, as Caron and Becker were to hasten after the robbery to the place where the panel truck was parked and switch over to the panel truck and drive away, leaving the "illegitimate" car where the panel truck had been. Castello, Tarricone and DiCanio, in Castello's Chevrolet, each armed with a loaded revolver selected from Castello's arsenal, were to follow Caron and Becker in the stolen car to the bank and park the Chevrolet across the street, so that they might instantly follow the "getaway" car after the robbery, and impede or make impossible any pursuit. Accordingly, the Chevrolet was called the "crash" car.

On April 8 the active participants, according to Becker, reconnoitered the bank, decided which teller's window looked the most promising, and, at Castello's barber shop at 557 Euclid Avenue, selected the automobile they would steal for use as the "getaway" car. It was a black 1951 Ford and was parked on Doscher Street, plainly visible from the barber shop. Caron forced open the window of the Ford, jumped the ignition, started the engine, and turned the car over to Becker, who drove it to a parking lot near DiCanio's apartment in The Canarsie Project.

After some further "casing" of the bank early in the morning of April 11, someone noticed that Becker's hair was "bright red," and Castello told his wife to go out and buy some hair dye and change the color of Becker's hair to a "medium brown." Apparently no one noticed that Becker was wearing a pink shirt.

Then the group started for the bank. Everything seemed to go according to schedule. Becker entered the bank, got on the line at what was supposed to be the best teller's window for the project; but, when he showed the woman teller there his revolver and told her to keep quiet and "hand over all the bills starting with the big ones," the woman let out a shriek and fell to the floor. In dismay Becker ran out, jumped in the "getaway" car where Caron was waiting for him with the engine running, and they soon disappeared around the corner of the next street. They drove to Repose Place, switched over to Caron's truck, reaching Castello's apartment shortly after the arrival of the trio in the "crash" car.

■ Much is made by appellants of the alleged lack of corroboration. But the trial judge explicitly instructed the jury that Becker's testimony must be scrutinized "with care and caution"; and this is all that is required by the ruling in Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442, as we have often had occasion to say.

Besides, the corroboration was more than ample by any standard, however strict. Mrs. Anne Peltier, whose courageous and intelligent conduct frustrated the robbery, identified Becker as the robber. So did the bank guard, Walsh, who saw Becker run out of the bank and noticed the pink shirt. The owner of the Ford testified that his car was stolen and that it was found in Repose Place, where Becker said the switch was made. DiCanio led the police to the place where the revolvers had been secreted, and they were produced at the trial. Detective Myers testified that DiCanio told him he had received the guns from Becker.

Mrs. Castello testified that she dyed Becker's hair at her husband's request, although she did not seem to remember the exact date when this was done.

In addition to all this, an inmate of the Raymond Street jail testified that, in the jail on October 15, 1955, Tarricone and DiCanio, in the presence of Castello, told him they did the job.

It is quite immaterial that no witness noticed the "crash" car. Nor is it a matter of consequence that Mrs. Castello did not seem to remember some of the things Becker testified were said and done in her presence.

■ Vigorous objection is made to a ruling of the trial judge which permitted Mrs. Castello to testify that, after she dyed Becker's hair, Becker walked back into the kitchen and her husband told her that he was not going to get into any trouble, that Caron and Becker "were supposed to be in the getaway car" and Tarricone, DiCanio and himself "were supposed to follow to see * * * that nothing interrupted what was supposed to go on." After Castello returned, she heard him say, "It didn't come off." Relying on Mayola v. United States, 9 Cir., 71 F.2d 65, appellants claim these statements were narrative, not made in furtherance of the conspiracy, and not admissible. But the facts of the Mayola case bear no resemblance to those before us here. The jury was entitled to infer from the testimony of other witnesses that Mrs. Castello was an active participant in the conspiracy, and that the statements were made by Castello as an integral part of and in furtherance of the conspiracy. We see no error here.

The instructions to the jury were entirely unexceptionable and adequate. Appellants were not entitled to have their own particular formula used on the subject of the duty of the prosecution to establish every material element of the crimes charged by proof beyond a reasonable doubt.

■ Appellants had a fair trial, there was much more than sufficient evidence to support the verdict, and appel-

lants' other contentions do not merit discussion.

While the point has not been raised, we note that appellants were sentenced to a term of imprisonment for five years on the conspiracy count, and to concurrent terms of eighteen years each on Counts Two and Three. As the conviction under 18 U.S.C. § 2113(a) became merged in the conviction of the aggravated offense described in 18 U.S.C. § 2113(d), the sentence under Count Two must be vacated. Prince v. United States, 77 S.Ct. 403; cf. United States v. Donovan, 2 Cir., 242 F.2d 61.

The judgments of conviction are affirmed and the sentence under Count Two vacated.