**UNITED STATES of America,**
Appellee,

v.

**Carmine J. PERSICO, Jr., Salvatore Albanese, Hugh McIntosh, Ralph Spero, and George LaFante, Appellants.**

**No. 358, Docket 27298.**

United States Court of Appeals
Second Circuit.

Argued May 21, 1962.

Decided July 13, 1962.

Maurice Edelbaum, New York City, for appellant Persico.

Frances Thaddeus Wolff, New York City for appellants Albanese and Spero.

Philip Dinitz, Brooklyn, N. Y., for appellant McIntosh.

Jerome Lewis, Brooklyn, N. Y., for appellant LaFante.

Joseph J. Marcheso, Asst. U. S. Atty., for Eastern Dist. of New York, Brooklyn, N. Y. (Joseph P. Hoey, U. S. Atty. for Eastern Dist. of New York, on the brief), for appellee.

Before LUMBARD, Chief Judge, and SMITH and MARSHALL, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

Appellants Persico, Albanese, McIntosh, Spero and LaFante and one Magnasco were tried to a jury in the Eastern District of New York, Mishler, J., on two counts of obstructing the movements of goods in interstate commerce by armed robbery, the hijacking of a truck carrying piece goods, and conspiring to do so in violation of 18 U.S.C. § 1951, the Hobbs Act. On May 13, 1961 the jury disagreed. Some three weeks later the defendants were tried before a second

jury, Matthew T. Abruzzo, District Judge, presiding. Persico, Albanese, McIntosh, Spero and Magnasco were found guilty on both counts, LaFante on the consiracy count only. Prior to the date set for sentencing, Magnasco was shot and killed. The others all were sentenced to terms of imprisonment, Persico for 15 years concurrent on both counts, Albanese 10 years concurrent on both counts, McIntosh 10 years concurrent on both counts, Spero 10 years concurrent, LaFante 5 years on Count 2. All appeal. The principal grounds for appeal are claimed prejudicial conduct of the trial, prejudicial summation of the Assistant United States Attorney, and conviction on the uncorroborated testimony of an accomplice and co-conspirator. We reluctantly conclude that the first two grounds are well taken, and reverse and remand for new trial.

The Government's case was based primarily on the testimony of one Vaccaro, an alleged co-conspirator, and that of one Kennedy, employee of Akers Motor Lines and driver of the hijacked truck.

Vaccaro testified that on July 27 and 28, 1959 he was in a bar in Brooklyn not far from the Akers Terminal, with Persico, McIntosh, Spero, Albanese, Magnasco and LaFante, and that it was there planned that a truck carrying piece goods should be held up and taken to LaFante's garage. Vaccaro was to spot a truck with piece goods loading at Akers Terminal, then with Albanese to get a Buick car previously stolen, Albanese, Spero and Vaccaro to follow the truck and when feasible kidnap the driver, Spero to drive the truck to LaFante's garage, Albanese and Vaccaro to drive the truck driver around in the Buick until notified that the theft had been completed, McIntosh to rent a truck to which the goods could be transferred at LaFante's garage, Persico, planner and director of the operation, to be at the garage to assist in the transfer. Magnasco was to be called when the hijacked truck was unloaded and abandoned and was to notify Vaccaro and Albanese when they telephoned in, so that they might release the truck driv-

er. According to Vaccaro, the plan went off as scheduled so far as his knowledge went and the proceeds of the sale of the goods were divided among the seven conspirators.

Kennedy, an obviously reluctant witness, testified to the holdup, kidnapping and ride in the Buick until released, but claimed that because of the use of taped glasses which the kidnappers required him to wear he was unable to identify the hijackers.

Vaccaro had been convicted in 1940 of possessing and uttering counterfeit money, receiving a suspended sentence and probation, in 1942 of robbery, receiving a sentence of seven to fourteen years, released on parole after four years and ten months, in 1947 of robbery, receiving a sentence of two to three years and revocation of parole on the 1942 sentence. He served until November 27, 1957. In February, 1960, he was in jail awaiting trial on state charges of robbery and other crimes. As a result of a conversation between Vaccaro and another jail inmate, Vaccaro was visited by FBI agents. Vaccaro at first denied knowledge of the Akers holdup. After being told he faced a possible life sentence if charged as a subsequent offender, but could help himself, and specifically that the FBI would make known to the officials that he was a Government witness and very cooperative and that a member of the United States Attorney's office would so inform the state judge before whom he was to be sentenced, Vaccaro agreed to disclose what he knew of the Akers hijacking and testify concerning it.

█ The Government's case rested entirely upon the uncorroborated testimony, inconsistent with his earlier testimony in some respects, of an accomplice and co-conspirator who had the strongest possible reasons to become a Government witness. We must therefore scrutinize any claimed error with extreme care since there is grave possibility of prejudice to the defendants in a case such as this by error which might in other circumstances be deemed relatively minor. Glasser v.

United States, 315 U.S. 60, 67, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The Assistant United States Attorney made several improper arguments during his summation. We consider it unfortunate in the extreme that counsel chose to misstate the facts and attempt to place before the jury matters not in evidence. United States v. Pepe, 247 F.2d 838, 844 (2 Cir., 1957). At one point in his summation he argued that the government did not call Andrew Russo as a witness because he was Persico's cousin. While no objection was made on the grounds that there was no evidence in the record as to any such relationship, it was tantamount to the prosecutor's testifying. Of more significance is counsel's repeated misstatement of the facts in asserting that there was actual evidence that the truck had been taken to LaFante's garage (stenographer's minutes 1092, 1144, 1145). While it is true that there was evidence from which the jury could properly have inferred that the truck was in fact taken to LaFante's garage to be unloaded, there was no direct evidence of this fact. For the prosecutor repeatedly falsely to summarize the testimony was highly prejudicial and the defendants' failure to object must be viewed in the light of Judge Abruzzo's repeated insistence that defense attorneys should cease making frivolous objection, or in fact any objections with respect to the prosecutor's summation of the facts until the summation was concluded.

Apparently determined to expedite the trial and avoid erroneous references to inadmissible matter by keeping a tight rein on counsel, because of a belief that a third trial would be impossible, the Court defeated its purpose by early embroilment with counsel. The judge's repeated recriminations and displays of temper towards defense counsel could not have helped but prejudice the jury. At the very outset of the trial, during the opening statements of defendant's counsel, a wholly unnecessary series of interruptions resulted from the judge's attempt to limit the opening statement to the facts which counsel intended to prove on direct examination. The ruling that counsel could not refer to facts he intended to prove by cross-examination was particularly erroneous in view of the fact that such information had been so obtained at the first trial. The interruptions and ensuing colloquies between the judge and counsel before the jury were particularly damaging because they were primarily related to statements concerning Vaccaro's credibility and possible motivation to bear false witness. The undoubted effect was to convince the jury that the trial judge was unimpressed by the attacks upon Vaccaro's credibility. It is true that the judge gave what he considered a "hard" charge on Vaccaro's credibility, but we cannot find that it erased the effect of the earlier restrictions on counsel's probing of the question. An example of the trial situation which developed is the exchange which occurred while Lewis, counsel for the defendant Albanese, was cross-examining Vaccaro.[1]

Cross-examination of Vaccaro was of course the principal recourse of the de-

---

1. "The Court: Oh, I am going to let him answer anything to—

If they have any more questions—ladies and gentlemen of the jury, let me make a statement to you at this time so that you will understand.

"All the convictions that this man has pleaded guilty to, all the crimes that he has committed, the defendants are entitled to prove that for one purpose only, to attack his credibility. And I am going to tell you that his credibility must be at issue because of these convictions.

"Now, I might say to counsel that there is so much here that the jury can say that the witness can or can't be believed. And that we are now getting down to such small things that we are wasting time, because you are entitled to the charge right now, and if you prove ten more things the charge wouldn't be any more severe than it is going to be.

"Now, if you want to go into that, go ahead and ask this man about fifty more crimes, ask him.

"Now, let me see, the question may be marked for identification and I will let

fense. The worse his history the more likely that extremely heavy sentences were facing him, and the more he need-ed help from the prosecution in this case. And of course counsel was entitled to show not only sufficient to induce the

the witness—I will let you read the answer. Read the answer.

"(Question on page 636, testimony of May 3, 1961, referred to, was received and marked Defendant's Exhibit L for identification.)

"Q. (Continuing) 'A. I refuse to an-answer that question.'

"The Court: Now, wait a minute. Ladies and gentlemen of the jury, this witness, like any other witness, has a right to invoke his constitutional rights and not answer any questions that would indicate that he committed a crime.

"Now, I am going to go along and charge the jury as you gentlemen go along and ask questions. He had a perfect right to refuse to answer the question under his constitutional right.

"Now, proceed from that to the next question.

"*By Mr. Lewis:*

"Q. Mr. Vaccaro, where did you work before March of 1959? A. In a construction company.

"Q. When? A. In the summer.

"At the end of the summer of 1958.

"Q. Where did you work in February of 1959? A. I wasn't working.

"Mr. Lewis: Page 643.

"Q. Was this question asked of you and did you give the following answer:—

"Mr. Marcheso: Will you wait just a moment?

"Mr. Lewis: Yes.

"(Continuing) 'Q. Where did you work before March, 1959? A. I refuse to answer that question.

"'Q. On what ground? A. On the grounds that it may incriminate me.'

"Did you make those answers? A. Yes, sir.

"Mr. Marcheso: Now, your Honor, I object.

"The Court: Let him have everything, Mr. Marcheso, please.

"Don't object to them. Let counsel ask any questions that they want of the witness.

"Mr. Lewis: I object to your Honor's remarks.

"The Court: I rule that they can ask any questions that they want.

"Mr. Edelbaum: I respectfully except to the remark.

"The Court: What is wrong with the remark? When I allow counsel to ask any questions that they want with respect to his credibility, what is wrong with that remark?

"Mr. Lewis: Except your Honor might think that I am transgressing the bounds of propriety.

"This man says—

"The Court: I think that in this case, Mr. Lewis, I might say to you that I think that this witness has been on for so long and he has admitted so many major crimes that when we get down to things like that, are you entitled to any more of a charge because of these little things? He is a self-confessed liar in many respects. He has been indicted and convicted in many respects. Do you think that the Court can make the charge to the jury any more severe because of these little things?

"These are little things in my opinion alongside of the other things that he testified to.

"Pardon me, but I have got to use the phone.

"Mr. Lewis: All right.

"Mr. Dinitz: May I leave the court room?

"The Court: No. Nobody leaves the court room.

"(Short recess.)

"The Court: Proceed.

"*By Mr. Lewis:*

"Q. Mr. Vaccaro, where did you live in February of 1959? A. 902—43rd Street, Brooklyn.

"Q. And who paid the rent there?

"The Court: Excluded. Not germane to this issue.

"Q. And you tell us, sir, that you are not working in February, 1959? Am I correct?

"The Court: Excluded. Already answered.

"Q. Mr. Vaccaro, will you tell the ladies and gentlemen of the jury how you supported yourself in that month?

"The Court: Excluded.

"Mr. Marcheso: Objection.

"Mr. Lewis: Exception.

"Q. Where did you work in January of 1959? A. I wasn't working.

"Q. Were these questions asked of you at the former trial and did you make these answers at page 644:—

"Mr. Marcheso: Will you wait just a minute?

"Mr. Lewis: 644.

"Mr. Marcheso: Now, your Honor, I am going to object to the reading of these questions because they are—

"The Court: I will allow the questions and answers, whatever they are.

judge to charge on credibility, but also any facts the jury might find likely to af-fect the probable sentence of the witness and so his motive to falsify. The power

"Q. 'Q. Where did you work in January, 1959? A. I refuse to answer that question.

" 'Q. On what ground? A. It may incriminate me.'

"Did you make those answers to those questions? A. Yes, sir.

"Mr. Marcheso: May I have an instruction as to the Fifth Amendment?

"The Court: Yes. I will instruct the jury when I charge them. And I won't do any more instructing until then.

"Q. Did you ever at any time in your testimony at the previous trial say that you were not working in January or February, 1959?

"Mr. Marcheso: Objection.

"The Court: Excluded in that form. You have the minutes.

"You read the minutes if you have them.

"Q. Did you work in December of 1958? A. No, sir.

"The Court: I asked you when you asked the questions to close that book. And you are not to open that book until you are going to read the question and answer.

"Mr. Lewis: This is nothing—I am not reading anything from the—

"The Court: The jury might think that you are reading it. Why don't you follow my instructions? I don't want that book open. If you are asking questions the jury may get the impression that you are reading a question and an answer from a previous trial. And when you do that, you must say so, so that they will know it. Now, that is an easy instruction to follow. Open it whenever you want to but not when you are asking questions excepting concerning those minutes.

"Q. Were you working in December of 1958? A. No, sir.

"Mr. Lewis: Page 644.

"Q. Were these questions asked of you—

"Mr. Marcheso: I am going to object.

"The Court: Gentlemen, we will take a recess now for ten minutes.

"Everybody remain in the court room. The jury will pass out.

"(The jury thereupon retired from the court room at 12:00 noon.)

"The Court: Who is out on bail? What defendants are on bail?

"Mr. Edelbaum: Persico.

"Mr. Aldino: Mr. LaFonte.

"Mr. Fontana: Mr. Magnasco.

"The Court: Only the three of them are on bail?

"Mr. Aldino: Persico, LaFonte and Magnasco.

"The Court: All out on bail? Bail cancelled. Prisoners remanded until the end of the trial.

"Mr. Edelbaum: Your Honor, will you hear me?

"The Court: No further conversation with me, counselor. None of it. That is my order. Take an exception to it.

"Now, I will say this, I will stop at one o'clock today. From tomorrow on I will tolerate no lateness by any lawyer. Any lawyer that comes into this court room late—I have had about six latenesses, and I think that it is a conceived plan to just bait the Court.

"You will be on time, every one of you. If one of you, one lawyer comes in late I will hold you in contempt of court. I am giving you warning in advance.

"Mr. Edelbaum: Your Honor, may I say—

"The Court: Now, wait a minute. You take an exception to anything that I say. But there will be no conversation between you lawyers and me from now on. From now on we are going to hold sessions until six o'clock every night. And I don't care who is well and who isn't well. I don't believe you, I direct counsel to just take an exception.

"That is all.

"Mr. Edelbaum: Your Honor—

"The Court: There will be no conversation.

"Mr. Edelbaum: I take an exception.

"Mr. Lewis: I take an exception.

"Mr. Dinitz: Exception.

"Mr. Aldino: Exception.

"Mr. Fontana: We all have an exception.

"The Court: Yes. Take the prisoners into jail.

"(Court recessed.)

"The Court: Bring the witness back on the stand. And send word to the marshal's office that I will not agree to any visitations by any relatives by [sic] the prisoners when they are in this courtroom. They can get visitations from the lawyers only. If anybody wants to visit these prisoners they will have to go over to the jail.

"(Thereupon at 12:15 o'clock P.M., the jury returned to the courtroom.)"

of the judge to place a limit on cumulative evidence must be used sparingly in such a situation.

■ During the opening statement the judge asked Spero's counsel whether character witnesses would be produced. When Spero's turn to present evidence came the judge asked whether counsel intended to put on any witnesses. The answer being in the negative the court then stated: "You are going to rest without calling any witnesses." Counsel replying that was so, the Court added: "All right, so be it." This was an unnecessary and improper comment upon the defendant's failure to take the stand or call any character witnesses.

Judge Abruzzo's comments during the prosecutor's summation could not but make it appear to the jury that the lawyers, as well as the defendants, were on trial. The judge repeatedly stated that defendants' counsel were making "facetious" and unfounded objections. In the first place we think if defense counsel act improperly they should be dealt with by sharp reprimand outside of the hearing of the jury or if necessary by use of the contempt power. In the second place, the objections were not entirely groundless, especially in view of the Assistant United States Attorney's proclivity to misstate and overreach the facts.

■■ While the judge has an active role to play in the search for truth through the trial process, he must take great pains to avoid giving the jury an impression that he is partisan. United States v. DeSisto, 289 F.2d 833 (2 Cir., 1961). Although the court was at times provoked by defense counsel that is no justification for allowing the trial to become a running battle between the court and counsel before the jury. And improper conduct of counsel is not to be remedied by revocation of his client's bail or restriction of visiting privileges, as was attempted here. As this court had occasion to say in a similar case:

> "Thus at numerous pages of the printed appendix the judge exhibited an attitude of impatience, and an annoyance at proper objections and interruptions as if they were captious, absurd or unnecessary. And occasionally the judge made gratuitous comments disparaging the defense counsel and the defense. * *

> "While an appellate court should be loath to read too much into the cold black and white of a printed record, it cannot disregard numerous remarks from the bench of a nature to belittle and humiliate counsel in the eyes of the jury." United States v. Ah Kee Eng, 241 F.2d 157, 161, 62 A.L.R.2d 159 (2 Cir., 1957) (alternate holding).

We find it unnecessary to reconsider the long standing federal rule that the testimony of an accomplice or codefendant is sufficient to support a conviction. E. g., Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917); Heitler v. United States, 244 F. 140 (7 Cir., 1917); Rosen v. United States, 271 F. 651 (2 Cir., 1920); United States v. Riedel, 126 F.2d 81 (7 Cir., 1942); United States v. Cook, 184 F.2d 642 (7 Cir., 1950); United States v. Tarricone, 242 F.2d 555 (2 Cir., 1947).

The convictions of appellants are reversed and the case remanded to the District Court for a new trial.