**UNITED STATES of America,
Appellee,**

v.

**Carmine PERSICO, Salvatore Albanese,
Ralph Spero, and Hugh McIntosh,
Appellants.**

**Nos. 486–489, Dockets 34016, 34119,
34235 and 34344.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 1970.

Decided April 15, 1970.

Maurice Edelbaum, New York City (Lawrence K. Feitell, New York City, of counsel), for appellant Persico.

Robert Kasanof, New York City, for appellant Albanese.

Frances T. Wolff, New York City (Jerome Lewis, New York City, of counsel), for appellant Spero.

Edmund A. Rosner, New York City, for appellant McIntosh.

Robert M. Ornstein, Special Atty., Dept. of Justice, Brooklyn, N. Y., Thomas M. Vockrodt, Atty., Dept. of Justice, Washington, D. C. (Edward R. Neaher, U. S. Atty., Eastern District of New York, on the brief), for appellee.

Before MOORE, HAYS and FEINBERG, Circuit Judges.

HAYS, Circuit Judge:

Carmine Persico, Salvatore Albanese, Ralph Spero and Hugh McIntosh appeal from judgments of conviction entered after a jury trial in the United States District Court for the Eastern District of New York on a charge of robbery of merchandise moving in interstate commerce 18 U.S.C. § 1951 (1964) and of conspiracy to commit the robbery.[1] Appellants also appeal from the denial of their pretrial motion to dismiss the indictment "on the ground that the long delay and repeated trials have seriously prejudiced them and constitute, in effect, cruel and unusual punishment."

## I.

### Background

The appellants have been tried five times on an indictment filed in April 1960 charging them with hijacking and conspiring to hijack a truck loaded with piece goods from the Akers Motor Lines Terminal in Brooklyn on or about July 28, 1959. The first trial, in May 1961, ended in a jury disagreement. The second trial, in June 1961, resulted in convictions of the present appellants on both counts.[2] We reversed these convictions because of errors at trial. United States v. Persico, 305 F.2d 534 (2d Cir. 1962). The third trial in the spring of 1963 was aborted as to appellants Persico, Albanese and Spero[3] by the declaration of a mistrial. The jury disagreed as to the other defendants. The fourth trial, which lasted from January to April 1964 resulted in the conviction of all the appellants. We reversed these convictions because of errors in the trial judge's charge. United States v. Persico, 349 F.2d 6 (2d Cir. 1965).

The fifth trial which is the subject of this appeal took place in April and May of 1968. The jury returned verdicts of guilty on May 9, 1968. On October 11, 1968, in response to appellants' post-trial requests for relief, the trial judge distributed to all parties copies of a memorandum and order which he intended to file, dismissing the indictment. The de-

---

1. Persico and McIntosh received sentences of fourteen and nine years respectively on each count, the sentences to run concurrently. Albanese and Spero received suspended sentences of ten years on each count, the sentences to run concurrently, and were placed on probation.

2. Joseph Magnasco was convicted on both counts, but was shot and killed before sentencing. George La Fante was convicted on the conspiracy count only. At the trial of the present case Judge Dooling directed La Fante's acquittal for lack of sufficient evidence.

3. This mistrial was ordered because Persico was shot and wounded on a Brooklyn street.

cision to dismiss was based on Judge Dooling's conclusion:

> "that the history of the present case through the date of verdict in the fifth trial, including the merely marginal fairness of the fifth trial, reflects transgression of the due process limitations upon the governmental rights of retrial and orderly deliberateness in seeking retrial * * *. It is not suggested that the subtraction of a single element of the whole history through the time of the rendition of the verdict would not require, or at least justify, a different result. It is held that the aggregate here has reached the point at which to enter judgments of conviction against the defendants would be to deny them due process.

> "On these grounds it is concluded that Counts 1 and 2 of the indictment must be dismissed by appropriate order as to the moving defendants."

The Government sought mandamus from this court ordering Judge Dooling to enter judgment on the jury verdicts and to impose sentence. We granted the relief requested. United States v. Dooling, 406 F.2d 192, 198 (2d Cir.), cert. denied, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969).

The factual background of this case is relatively simple and has been adequately reported in our earlier opinions. See 305 F.2d at 536, 349 F.2d at 9. As in the earlier trials, the government's case in the latest trial was based primarily on the testimony of Gasper Vaccaro, an alleged co-conspirator, and Edward Kennedy, an employee of Akers Motor Lines and driver of the hijacked truck.[4] However, at this trial for the first time the government called as a witness Joseph Valachi, who recounted certain admissions alleged to have been made by several of the appellants.

Appellants do not attack the sufficiency of the evidence, but make numerous claims of error. We are not persuaded that any of these allegations warrant reversal and therefore affirm the judgments of conviction.

## II.

### Failure of the Government to Inform the Defense That Joseph Valachi Was to Be Called as a Witness

Appellants contend that the failure of the government to give advance notice of its intention to call Jospeh Valachi as a witness requires reversal. Valachi achieved notoriety as a result of his testimony concerning organized crime before a Senate Committee in 1963 and elsewhere. Appellants maintain that the failure to inform them of Valachi's impending appearance prevented their suggesting prophylactic measures to counter the possibility of prejudicial publicity, and deprived them of a proper voir dire of the jury and the full advantage of their peremptory challenges.

 There is no obligation on the part of the government to inform the defense of its intention to call a witness when the indictment is for a non-capital offense. See 18 U.S.C. § 3432 (1964); United States v. Van Duzee, 140 U.S. 169, 173, 11 S.Ct. 758, 35 L.Ed. 399 (1891); Thompson v. United States, 381 F.2d 664, 665–666 (10th Cir. 1967); United States v. Chase, 372 F.2d 453, 466 (4th Cir.), cert. denied, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626 (1967); Dean v. United States, 265 F.2d 544, 547 (8th Cir. 1959).

Appellants' suggestion that the government intentionally and affirmatively misled them into believing that no new witnesses would be called is expressly contradicted by the record.

## III.

### Publicity Surrounding the Appearance of Valachi

Shortly after 3:00 P.M. on April 16, 1968, the government indicated its intention to call Joseph Valachi as its next

---

4. Their testimony is summarized in United States v. Persico, 305 F.2d 534, 536 (2d Cir. 1962).

witness. The defense pleaded surprise,[5] objected to Valachi's appearance and questioned his testimonial capacity. The argument on these issues lasted the rest of the day.

That evening and the next morning all the New York newspapers and many of the radio and television stations carried news announcements stating that Valachi was to be called as a witness. Many of these announcements contained details about the trial and the defendants. The article from the Four Star Edition of the April 17, 1968, New York Daily News, which most of the jurors saw, appears in the margin.[6]

5. Appellants allege that the government had "leaked" the news of Valachi's appearance to the press, thus aggravating the publicity problem. The government strongly denies the accusation and, given the tenuous nature of the appellants' "proof," we do not consider this a relevant factor in determining whether the publicity requires reversal.

6. The front page of the Daily News contained in one and one half inch letters the headline: "CALL VALACHI IN COSA TRIAL." The story on page two was headed "Call Valachi to Testify in Hijack Trial." Pictures appeared of Judge Dooling, Persico and Valachi. The text of the article states:

"The government dropped a bombshell into the hijacking trial of Cosa Nostra figure Carmine (The Snake) Persico and four others when it announced yesterday that it will call underworld informer Joe Valachi as a witness.

"Victor Woerheide, special prosecutor trying the case for the Department of Justice in Brooklyn federal court, introduced his shocker just before 4 p. m. after the jury had been dismissed for the day. Woerheide said Valachi would be called today.

"However, this set off two hours of legal wrangling in the courtroom before U. S. District Judge John F. Dooling Jr. And Dooling put off Valachi's appearance until 2 p. m. Monday.

"This was to give the defense time to prepare for the appearance of the star informant for the FBI, and to inspect records in Washington. The defense lawyers had claimed that Valachi's testimony would make it impossible for their clients to get a fair trial.

"*First Court Appearance*

"Valachi, the gravel-voiced songbird whose mouthings on the Mafia before the Senate rackets committee in 1963 startled the nation, has never appeared in open court, although he has testified before grand juries.

"Valachi has been brought from the maximum security of the federal prison in Milan, Mich., and is under tight guard in the U. S. Courthouse in Brooklyn. Only federal marshals are permitted near him.

"According to Woerheide, Valachi will testify about two admissions made by three of the men on trial.

" 'These admissions are statements made by the defendants about themselves and (relevant) to the matter on trial,' Woerheide told the court. The statements were made in April 1959 and June 1961, he said.

"Persico, 35, of 144 Sunset Drive, West Hempstead, L. I., graduated out of the Profaci mob that rules Brooklyn to a setup of his own, the government contends. He and the four other defendants are charged with stealing a $50,000 shipment of dry goods July 28, 1959, while it was in interstate commerce.

"The other defendants are Salvatore Albanese, Hugh McIntosh and Ralph Spero, all of Brooklyn, and George Lafante of South Ozone Park, Queens.

"After the jury was dismissed to return at 10 a. m. today, Woerheide disclosed the government's hand on Valachi. He said the prosecution was calling the witness 'in good faith.'

"Answering the defense's protests, the prosecutor notes that Valachi was not himself a defendant or a conspirator in the case. He insisted that the government should not be told whom it can call to prove its case.

"Attorneys for the defendants bitterly attacked the move. They made a variety of motions, calling for a mistrial, asking that the jury be dismissed and another one called, and that the indictment be quashed.

"*Rap Lack of Notice*

"The lawyers said they would have asked prospective jurors for their opinion of Valachi had they been told ahead of time that the government intended to call him.

"Valachi is under a life sentence for the murder, on June 22, 1962, of a cellmate in the Atlanta penitentiary who he suspected was assigned to kill him. Reportedly the underworld has put out a $100,000 'contract' for his assassination.

Not all of the jurors were exposed to the same quantity or quality of publicity.[7] However, taking the publicity at its worst it indicated that appellants were connected to the Cosa Nostra; that Persico was nicknamed the Snake, and had graduated out of the Profaci mob; that the case had been tried four times previously; that a special prosecutor from the Department of Justice was trying the case; that Valachi was a former underworld figure who had previously testified concerning organized crime; that the government was concerned for Valachi's safety; and that the admissions about which Valachi was to testify had been made to him while appellants were in prison.

The publicity to which the jurors were exposed did not deal with the issues of appellants' guilt, as in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966), and Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L. Ed.2d 663 (1963), but involved background information. Most of the material, save the reference to Cosa Nostra which we believe to have been dealt with

effectively, was brought out at trial as competent evidence.

The three weeks that passed before the jury was called upon to make its decision also served to blunt much of the adverse effect of the publicity. See United States v. Kahaner, 317 F.2d 459, 470 (2d Cir.), cert. denied, Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963).

Appellants moved for a mistrial on the ground that the publicity prejudiced the jury, making it impossible for them to receive a fair trial. The trial judge took prompt and effective corrective action. See United States v. Agueci, 310 F.2d 817, 832 (2d Cir. 1962), cert. denied, Guippone v. United States, 372 U. S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). He held a separate voir dire of each juror, frankly and candidly discussing the problems caused by the publicity. He correctly isolated the reference to the Cosa Nostra as the most potentially prejudicial aspect of the publicity and placed that element in its proper perspective by instructing each juror that it was completely irrelevant to the case.[8] After completing this process

---

"Valachi, in nationally televised hearings before the Senate committee, spelled out the workings of the Cosa Nostra or Mafia, as the nationwide underworld syndicate is known. He shed new light on the workings of organized crime in a 300,000-word statement laboriously written by hand on yellow legal tablets in fifth-grade English.

"He had been inducted into the Cosa Nostra at the age of 27 in 1930, Valachi said. The ceremony took place in the backroom of a New York restaurant. A gun and a knife were on the table. Blood was drawn from the young thug's finger as he told his inductors, 'If I talk, I die.'

"His sponsor was Vito Genovese, 'Capo di tutti capy,' or boss of all bosses in the Mafia.

"From 1930 to 1962, Valachi kept his underworld trust, piling up 18 arrests for burglary, robbery, assault, gambling and dope. Sent to Atlanta in 1959 on a narcotics rap, he learned he was marked for death by Genovese. And he killed the man he thought was sent to kill him."

7. The fourteen jurors and alternates were examined separately. Three jurors stated they saw only newspaper headlines; ten had read all or part of the article in the New York Daily News and one had read the account contained in Newsday, a Long Island newspaper. In addition, some of the jurors stated that they were exposed to radio and television reports of the trial, which contained essentially the same material appearing in the newspaper articles. It is also possible that at least one of the jurors read the articles contained in the New York Times and/or the New York Post.

8. For example, the voir dire of juror Charles Cohen went as follows:
"The Court: Mr. Cohen, we are quite concerned about whether or not the newspaper, radio and television publicity that our case has received might have had some affect [sic] on the Jury's attitude towards the case, and I do want to ask some questions about that.
"Did you have a chance, Mr. Cohen, to read any of the newspaper articles or to hear any of the radio or television material?

and carefully considering the problem, Judge Dooling concluded that, although the publicity was prejudicial, the jurors remained capable of giving the appel-

"Mr. Cohen: Yes, sir, I did.

"The Court: Did you see the Daily News article?

"Mr. Cohen: Yes, I did.

"The Court: I think that had the completest material.

"Mr. Cohen: I did.

"The Court: Did you see the Times article?

"Mr. Cohen: No.

"The Court: Now, has there been any discussion of the articles and of the radio and television material in the Jury room?

"Mr. Cohen: I wouldn't say exactly discussion, there might have been a mention that this person read it, someone else said they bought the paper and tore it off the front page, that they didn't want to go any further, and that was about the general extent.

"The Court: Was there any talk about the pictures that were in the Daily News?

"The Witness: There was one mention of your picture.

"The Court: I am never going to live this down.

"Mr. Cohen, as you know, this case is about one thing and one thing only, and that is this:

"Whether or not the defendants or some of them did or did not obstruct the movement in interstate commerce of that Acres [sic] truck by robbery, or whether one or more of them conspired with the others about that.

"It is not about anything else.

"Now, if any effort had been made to introduce into this Courtroom here testimony about Cosa Nostra, it would have been excluded because it has absolutely nothing to do with whether or not these defendants interfered with that truck shipment. Just because that couldn't be brought in against them, for the same reason these men cannot defend themselves against it, they can't come in and try to present the testimony to negative this at all.

"As a matter of fact there isn't any such crime as Cosa Nostra, you can't be indicted for Cosa Nostra in any Court anywhere, and so these men have never had a chance to meet that charge anywhere, and they never will be able to come into a Court and blast it out of the water.

"It is a smear and it pursues them and there is nothing they can do about it, it is just talk and they can't meet it no place, and they can't even meet it here today because it has nothing to do with this case.

"Nevertheless, there it is, it has been said.

"Now what we have to try to figure out is whether or not the fact that it has been said and the way it has been said and that it comes inevitably to the notice of you Jurors means we are in trouble in assuring them the fair trial that each one of us wants to see that they get, and the Jurors most of all.

"So what I want to ask you is whether notwithstanding the publicity, you can say whether or not you are satisfied about your capacity to listen to the evidence in this case and to no other evidence, no other talk, and decide this case fairly to them and to the Government without reference to this publicity.

"Do you think you are up to that or is that something that you would say is beyond the compass of the human mind?

"Mr. Cohen: No, I would say that I would be able to continue.

"The Court: Here is one way of putting it up to you, it calls upon you to perform a kind of an imaginative feat that is pretty unreal but I wish you would make the effort:

"Put yourself in the position of one of the defendants here, think of him as being on trial before this Jury, and then look into your own mind with his eyes and tell me whether or not you think that your mind, looked at with the eyes of one of the defendants, would appear to him to be the mind of the man that he wants to have stay on this Jury:

"Now, tested by that standard, what is your answer, would you be able to continue fairly to both sides in this case?

"Mr. Cohen: That would be my answer, to continue and be fair by what I hear.

"The Court: Thank you, sir.

"Now, when you go back to the Jury Room, Mr. Cohen, I would ask you not to discuss our interview with any of the other Jurors because we want to get their individual reaction.

"Mr. Cohen: I understand.

"The Court: And responses.

"Mr. Cohen: I understand, yes, sir.

"The Court: Thank you, sir."

lants a fair trial. In denying a motion for mistrial, he stated:

"Some very considerable part of the prejudicial matter is strongly implied by other evidence properly in the case, by the competent substance of Valachi's testimony and its essentially indivisible nature and by the very calling of Valachi as a witness and the identifying of his criminal record.

"But the publicity and the other circumstances attending Valachi's testimony, added to the inevitable and inescapable atmosphere and tensions of this trial, is not accurately measurable; but I am unable to find indications that it is sufficient as to prevent a fair trial.

"The existence of this readily regrettable prejudicial matter challenges the jury to be fair, to be faithful to their oaths. The jury cannot be taken to lack either the will or the capacity to base their verdict only on the evidence properly before them. The issues of fact are simple. The irrelevant prejudicial matter is easily isolated, and I find no basis for concluding that the jury will be unequal to its task."

■ We think this determination was correct both because the publicity objectively viewed in the setting of the trial was not so prejudicial to Persico or to his co-defendants that declaring a mistrial was the only avenue open to the trial judge, and because proper corrective procedures were employed.

■ The issue of whether the nature of prejudicial publicity is such that a fair trial cannot be had is always difficult and "each case must turn on its special facts." Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) (per curiam). The trial judge has broad discretion in determining whether prejudice has resulted. E. g., id.; Holt v. United States, 218 U.S. 245, 251, 31 S. Ct. 2, 54 L.Ed. 1021 (1910).

■ Since the publicity was not inherently prejudicial, consideration of its

effect upon each juror is crucial. The essential question which had to be answered was whether the jurors retained the requisite impartiality. Judge Dooling was in the best position to make this difficult evaluation. We attach great weight to his determination that the publicity did not prevent a fair trial.

## IV.

### Claim That Valachi's Testimony Violated the Rule of Bruton v. United States

Each of the appellants attacks certain of Valachi's testimony as violative of the rule announced in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and declared retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968) (per curiam).

Appellants' claims are addressed to two portions of Valachi's testimony. Valachi was asked about a conversation he was alleged to have had with Albanese. He answered:

"Well, he went on to tell me that this fellow Chink [Vaccaro] used to go out with him and his friends, and he mentioned Junior [Persico] and— [interruption]

\* \* \* \* \* \*

"Then he went on to tell me how this Chink used to go out with him on hijackings and—including the Aker [sic] job \* \* \*."

■ Perisco contends that Valachi's reference to Junior, by which the jury knew he meant Persico, constitutes a violation of the Bruton rule since it was an inadmissible inculpating hearsay statement. We reject this construction on the ground that Valachi's statement about Junior did not inculpate Persico. What Valachi said was merely that Albanese knew Persico or, at most, that Persico was a friend of Albanese, a fact that came out in other competent testimony.

■ On similar grounds we reject the argument advanced by McIntosh and

Spero that Valachi's statement about Albanese's reference to "his friends" must have been thought by the jury to refer to, and therefore to inculpate, them.

■ Valachi also testified to a conversation he had with Persico in the presence of Albanese and McIntosh who had joined them at the request of Persico. Valachi said:

"He wanted some advise [sic]. He knew I'd been around. I knew who he was, he knew who I was, through friends. He wanted to know—first he told me he'd been paying taxes on all the hijackings that he's been pulling especially the one that he was on trial for, the Aker's [sic] truck. He paid Joe Profachi [sic] $1800. He wanted to know if he was in his rights having trouble with Joe Profachi [sic].

"Well, in my experience I was astounded * * *

[Interruption]

"A. I told him it was not taxes at all, it was an out and out shakedown and he was 100 percent right in having trouble with Joe Profachi [sic].

"Q. Did Mr. Persico say anything to Mr. Albanese or to Mr. McIntosh in your presence? A. He told them in the future, 'Pay attention to Joe. Listen to him. You want any advise [sic], ask him.' That's all.

"Q. When he said Joe, to whom was he referring? A. Me."

Albanese and McIntosh claim that the admission of Valachi's testimony that they were present at the times Perisco admitted his part in the Akers' hijacking constitutes a violation of Bruton. However, as the trial court held:

"That testimony was, however, directly descriptive of the observed acts of Albanese and McIntosh and Valachi could be fully cross-examined about what he saw and what obedience to Persico's command he observed; the testimony did not relay to the jury words of a non-testifying Persico that accused Albanese and McIntosh of complicity in the crime."

Moreover, the trial court correctly instructed the jury that complicity could not be inferred from silence.

### V.

### Limitations on Cross-Examination

■ The trial judge ruled that two of the government's witnesses, Vaccaro and Cancelli, need not disclose their addresses or places of employment. The appellants contend this limitation violated their Sixth Amendment right to confront the witnesses against them. They rely heavily on Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), and Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). In Smith, a crucial prosecution witness testified under a false name and the defense was not allowed to elicit his true name or address on cross-examination. The Court reversed the conviction since "The witness' name and address open countless avenues of in-court examination and out-of-court investigation." Id. at 131, 88 S.Ct. at 750. In Alford, the defense was prevented from obtaining the address of a crucial prosecution witness, who defense counsel had reason to believe was then in custody, id. at 693, 51 S.Ct. 218. The Court also reversed that conviction.

The Court in Smith quoted with approval language from Alford:

"There is a duty to protect him [the witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him." Alford, at 694, 51 S.Ct. 218; Smith, at 133, 88 S.Ct. at 750.

And the illuminating concurrence of Mr. Justice White reads in pertinent part:

"In Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931), the Court recognized that questions which tend merely to harass, annoy, or humiliate a witness may go beyond the bounds of proper cross-examination. I would place in the same category those inquiries which tend to *endanger the personal safety of the*

*witness.* But in these situations, if the question asked is one that is normally permissible, the State or the witness should at the very least come forward with some showing of why the witness must be excused from answering the question. The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling. Here the State gave no reasons justifying the refusal to answer a quite usual and proper question. For this reason I join the Court's judgment and its opinion which, as I understand it, is not inconsistent with these views. * * * " Id. at 133–134, 88 S.Ct. at 751 (emphasis added).

It was primarily out of fear for the witnesses' personal safety that Judge Dooling limited cross-examination. We think that his determination was correct. After his conviction at the second trial, but before sentencing, a codefendant Joseph Magnasco was shot dead. The third trial was aborted in 1963 because Persico was shot and wounded on a Brooklyn street. See United States v. Bennett, 409 F.2d 888, 901 (2d Cir. 1969), cert. denied, 396 U.S. 852, 90 S. Ct. 113, 24 L.Ed.2d 101 (1969); see also United States v. Marti, 421 F.2d 1263 (2d Cir. Feb. 3, 1970); United States v. Palermo, 410 F.2d 468, 472 (7th Cir. 1969); United States v. Varelli, 407 F.2d 735, 750–751 (7th Cir. 1969).

In the case of the witness Vaccaro the limitation is further justified by the fact that he was well known to all defendants and their counsel, having testified at the four previous trials. His background was explored in great detail on cross-examination and the defense was informed of the nature of Vaccaro's recent activities. Moreover, the defense showed no "particularized need" for the information requested, United States v. Bennett, *supra*. Cancelli was known to the defense since he testified at the fourth trial. His testimony was not of central importance like that of the witnesses involved in *Smith* and *Alford*.

## VI.

### *Evidence of Other Crimes*

Appellants contend that prejudicial testimony concerning other crimes was erroneously admitted. Valachi's testimony included a reference to the Akers hijacking as one in a series and mentioned that Persico, and possibly, by implication, other appellants, were involved with one Profaci.[9]

As the trial judge noted, Valachi's testimony as to other crimes and criminal propensity was so closely bound up with his directly relevant testimony with regard to the Akers hijacking that unless the jury believed the relevant testimony it is quite unlikely that it would have been influenced by the accompanying testimony of other crimes. Moreover, much of Valachi's testimony of other crimes related to a course of conduct involving repeated instances of hijacking. This evidence was not inadmissible since it tended to support the testimony as to the Akers job.

Appellants complain of the admission of testimony about a stolen car. However since the stolen car was used in the hijacking the evidence was correctly admitted. McCormick, Evidence § 157, at 327 (1954) (quoted with approval in United States v. Bradwell, 388 F.2d 619, 622 (2d Cir.), cert. denied, 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968), and United States v. Bozza, 365 F.2d 206, 213 (2d Cir. 1966)).

## VII.

### *Repeated Retrials and the Right to a Speedy Trial*

Appellants contend that the repeated trials, and the delay of two and one half

---

9. Profaci was said to head an underworld group at war with the so-called Gallo gang for control of a substantial portion of organized criminal activities. Thus appellants maintain the reference to Profaci, assuming the jury knew who he was, indicated criminal propensity.

years [10] following this court's reversal in July 1965 of the verdict in the fourth trial, violated their right to a speedy trial and constitute cruel and unusual punishment. They claim that the indictment should have been dismissed on their motions and that they should not have been subjected to a fifth trial.

The claim that the indictment should have been dismissed because of the repeated retrials of this case was made to this court after the fourth trial and was rejected and a fifth trial ordered.

As for the claim of denial of a speedy trial, it appears from the record that the defendants acquiesced in the repeated postponements. There is no indication of "purposeful or oppressive" delay on the part of the government. Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). Moreover at no time prior to their motion in 1967 to dismiss the indictment did defendants make a motion to speed up the trial of their case or attempt in any other way to secure an early trial. See id. at 362 n. 8, 77 S.Ct. 481; United States v. Aadal, 407 F.2d 381, 382 (2d Cir.) (per curiam) (and cases cited therein), cert. denied, 394 U.S. 1008, 89 S.Ct. 1601, 22 L.Ed.2d 789 (1969); United States v. Lustman, 258 F.2d 475, 478 (2d Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958).

As the trial judge found, the specific circumstances advanced by appellants as constituting prejudice resulting from delay are not impressive.

Albanese's witness Eppilitto died between the fourth and fifth trials. He had corroborated in part Mrs. Albanese's testimony that Vaccaro attempted to rape her. At this trial the defense did not call Mrs. Albanese—perhaps because Valachi testified that Albanese admitted that the rape story had been fabricated. If Mrs. Albanese had testified, appellant could have read Eppilitto's prior testimony into the record. Moreover the government was ready to go to trial while Eppilitto was still alive and the trial delay past that point was not occasioned by the government.

Some possible witnesses to the hijacked truck's standing empty on the street had disappeared by the time of the instant trial. However, the F.B.I. memorandum disclosing the existence of these witnesses was admitted into evidence. The witnesses were not called at the fourth trial though they were then available.

The last special circumstance cited by the appellants was the failure of Gehring, who was terminal manager of Akers in 1959, to recall events to which he had testified in 1964. However, not only was Gehring a witness for the government, but his previous sworn testimony was available for use at this trial.

## VIII.

### Miscellaneous Contentions

Appellants' other assignments of error do not merit extensive treatment.

Spero claims that the questioning by the government of Kennedy, the driver of the hijacked vehicle, which established the fact that Spero's parents and Kennedy's sister-in-law resided at the same address, was undertaken to convince the jury that Spero was not identified by Kennedy because of an improper approach made by Spero or Spero's family to Kennedy or Kennedy's family. However, the evidence clearly established that Kennedy could not identify any of the hijackers because he had been blindfolded.

There was no impropriety in government counsel's consulting with law enforcement officials familiar with the area from which the jury was chosen during the jury selection process. See Hamer v. United States, 259 F.2d 274, 278–281 (9th Cir. 1958), cert. de-

---

10. The delay which occurred as a consequence of defendants' motion to dismiss the indictment, denied by Judge Weinstein on December 13, 1967, cannot be attributed to the government.

nied, 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed. 2d 577 (1959).

■ The appellants were not prejudiced by the discreetly conducted investigation of a juror and the trial judge's decision to excuse her on the ground that her husband had been convicted of an offense growing out of hijackings committed in the same neighborhood as that involved in the instant case was well within his discretion. See United States v. Zambito, 315 F.2d 266, 269 (4th Cir.), cert. denied, 373 U.S. 924, 83 S.Ct. 1524, 10 L.Ed.2d 423 (1963).

■ Finally the prosecutor's reference in his summation to uncontradicted evidence did not amount to a comment upon appellants' failure to take the stand. United States ex rel. Leak v. Follette, 418 F.2d 1266 (2d Cir. 1969) (and cases cited therein).

Affirmed.