UNITED STATES of America,
Appellee,

v.

Bernard J. CAMPBELL, Appellant.

Nos. 512, 513, Dockets 34173, 34174.

United States Court of Appeals,
Second Circuit.

Argued Jan. 22, 1970.

Decided April 29, 1970.

548

William Quinlan, New York City, for appellant.

Thomas J. Fitzpatrick, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, William J. Gilbreth and Gary P. Naftalis, Asst. U. S. Attys., of counsel), for appellee.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

HAYS, Circuit Judge:

This is an appeal from judgments of conviction entered against appellant in the United States District Court for the Southern District of New York upon a jury verdict finding appellant guilty of conspiring with others to bribe an officer of the Internal Revenue Service and to defraud the United States of delin-

quent taxes owed by Peter R. Matthews, in violation of 18 U.S.C. § 371 (1964) [1] and of aiding and abetting a revenue officer in the receipt of an unlawful fee for the performance of his official duty, in violation of 26 U.S.C. § 7214 (1964) and 18 U.S.C. § 2 (1964).[2]

The convictions were based upon appellant's participation in an unsuccessful scheme to defraud the government of approximately $500,000 in delinquent taxes owed by Peter R. Matthews on behalf of himself, his wife, and The Matthews Industrial Piping Corporation. The plan was to "fix" the collection of the delinquent taxes by bribing the revenue officers charged with their collection.

Matthews, a co-conspirator, testified at appellant's trial as a government witness. On appeal, appellant contends that the trial court erred in excluding 68 pages of Internal Revenue Service records relating to Matthews' tax delinquency offered as relevant to Matthews' motives and bias as a witness, that the charge of aiding and abetting was barred by the applicable statute of limitations and that a recording of a conversation between appellant and Matthews, made with Matthews' consent, was improperly admitted into evidence. We find no merit in appellant's contentions and accordingly affirm the judgments of conviction.

I.

The testimony given by Matthews was an important part of the government's case against appellant, particularly with respect to appellant's participation in the conspiracy.[3] On cross-examination,

---

1. Named as co-defendants and co-conspirators were David and Norman Kamerman, and Michael N. Laino, the revenue officer involved. Laino entered a plea of guilty. The Kamermans were tried separately and found not guilty. Matthews was named as a co-conspirator but not as a co-defendant.

2. Appellant was sentenced to two years' imprisonment, execution suspended, and two years' probation on the conspiracy

charge and to two months' imprisonment on the charge of aiding and abetting.

3. Matthews' testimony was corroborated in some respects by the testimony of Laino, the revenue officer involved in the scheme. Most significantly, Laino testified that he had received $300 from appellant, who represented that the money came from David Kamerman. Matthews in turn testified that he had given appellant $300 for the purpose of bribing Internal Revenue Service officials.

Matthews admitted that the Internal Revenue Service was pressing for the collection of his delinquent taxes at the time he went to them with the story of the scheme to fix their collection and that he still owed a substantial amount. He also stated that he had not yet been indicted for his part in the scheme. He denied, however, that he had ever discussed with Internal Revenue Service officials the possibility that in return for his cooperation they would not prosecute him or attempt to collect his delinquent taxes.

After Matthews had been cross-examined, appellant's counsel sought to introduce into evidence 68 pages of Internal Revenue Service files relating to the history of Matthews' tax delinquency account.[4] These documents were offered as relevant to the motives and bias of Matthews as a government witness. Defense counsel represented that the documents would show that Matthews had been accorded lenient treatment by the Internal Revenue Service after going to them with the story of the bribery scheme. The trial judge, after ascertaining from defense counsel that the proffered documents did not reflect any agreement with Matthews or conferences with Matthews concerning lenient treatment in connection with his cooperation and testimony, refused either to read the documents or to allow them to be admitted into evidence on the grounds that evidence of unilateral action taken by the Internal Revenue Service without Matthews' knowledge was not only irrelevant but also involved an impermissible exploration into the motives behind an executive decision.

█ In attempting to establish the motives or bias of a witness against him, a defendant may not only elicit evidence showing that the government made explicit promises of leniency in return for cooperation, but may also show conduct which might have led a witness to believe that his prospects for lenient treatment by the government depended on the degree of his cooperation. Actions evidencing the intention of the government to trade leniency for cooperation are, however, irrelevant unless it can be established that the witness knew of these actions. See Gordon v. United States, 344 U.S. 414, 422, 73 S.Ct. 369,

Matthews' testimony concerning the bribery scheme and appellant's involvement in it was also supported by statements made by appellant himself during a conversation he had with Matthews on January 3, 1967. Matthews made a recording of this conversation, and it was introduced into evidence at the trial. The following conversation took place:

Matthews: But Bernie all I'm interested is, all I'm interested is gettin some of my money back or tell me who the hell got it and I'll go up to that feller * * * in fact I went up to see Laino about a year ago and he said, he confirmed what you said $300 he said I'll give it to him back any time they want it that's the only.

Campbell: Ahh Bob let me tell you something. You give me ten days to two weeks and I'll have an answer for you but don't go around talking to people will you for god sakes will you do that?

Matthews: Bernie all I'm interested in is getting some of my money back that's all.

Campbell: If you had done this in the first place as we're talking now, instead of coming down.

Matthews: Well didn't I come down here and have everybody down in there, talk to you and talk to Dave and nothing became of it.

Campbell: He was always thinking —wired up.

Matthews: So far as I know, so far as I know.

Campbell: Hmm.

Matthews: You guys only passed $300 I don't know anything.

Campbell: That isn't true, (inaudible) I'm not kidding you that isn't true.

Matthews: Well I checked all over Jersey and over and no body got the— only one that admitted he got $300 was Laino, Mike Laino, no body else I've explored the thing and explored it and.

Campbell: Well will you, would you believe that's a fact.

4. These documents had been produced by the government for inspection at the defense's request.

97 L.Ed. 447 (1953), 3 Wigmore on Evidence §§ 948–49 (3d ed. 1940).

■■■ In determining whether the trial judge has abused his discretion in limiting the introduction of such evidence, the issue is whether the jury was otherwise in possession of sufficient information concerning formative events to make a "discriminating appraisal" of a witness' motives and bias. See Gordon v. United States, supra at 417, 73 S.Ct. 369. We have read the excluded 68 pages and find that they do not contain sufficient evidence in addition to that already before the jury relevant to Matthews' motives and bias as a witness to justify a finding that the trial judge erred in refusing to admit any or all of the documents into evidence.

The 68 pages refer only to the history of collection attempts with regard to a penalty assessment made against Matthews and his wife on account of delinquent taxes owed by The Matthews Industrial Piping Corporation which was wholly owned by them.[5] The amount of the penalty assessment was $34,197.06.

The assessment was made on March 4, 1966 and collection attempts began on March 8, 1966 when the account was received by the Manhattan district office of the Internal Revenue Service. The revenue officer to whom the account was initially assigned, recommended that since past experience with the taxpayers indicated that the assessment was uncollectible, it should be "53'd," that is, taken out of the collection process. This proposal was disapproved by the Collection Manager, who stated that the case required "extensive and qualitative investigation for location of income and/or assets. Supervisor is instructed to review and follow up closely on this case." The account was subsequently assigned to Revenue Officer Lawrence Batt.

Three series of events are revealed in the subsequent pages of the file which merit discussion as to their possible bearing on Matthews' motives and bias as a witness.

The first of the series occurred before Matthews went to the Internal Revenue Service with the story of the attempt to fix the collection of his delinquent taxes. Matthews revealed the scheme to Revenue Officer Batt on July 25, 1966 and discussed it with the Inspection Division sometime in September, 1966. On June 22, 1966, upon discovering that Matthews had borrowed some $99,000 from Industrial Piping between 1959 and 1965 without either repaying it or reporting it as income, Batt had prepared a "Referral Report of Potential Fraud Case," setting forth these facts and stating "Taxpayer has extensive history of not paying tax. It is believed taxpayer was previously convicted of Income Tax Evasion." [6] The fraud referral had been rejected on June 23, 1966 by the Intelligence Division before preliminary investigation on the ground that, for various technical reasons,[7] it had no criminal potential.

5. In the beginning of 1966, before he went to the Internal Revnue Service with the story of the attempt to fix the collection of his delinquent taxes, the Service had ruled that Matthews was individually liable for $373,258.73 in back taxes, plus interest, Mrs. Matthews was liable for $82,715.46 plus interest, and The Matthews Industrial Piping Corporation was liable for $136,797.27 plus interest. The tax delinquency accounts for Matthews and his wife individually had been "53'd" in 1965, that is, they had been determined to be uncollectible and taken out of the collection process, although they could be resurrected upon the discovery of new assets. The corporation's delinquency account was 53'd on October 25, 1966, after the Service had obtained $21,335.13 from its assets and the settlement of a suit brought by it.

6. Matthews admitted on direct and cross-examination that he had been indicted and had pleaded guilty to charges of income tax evasion with respect to taxes due from a corporation for the year ending June 30, 1952.

7. The reasons were stated as follows:
"1. The taxpayer's loan account on the books of the corporation has fluctuated during the years involved.
2. The years 1963, 1964 and 1965 are still open for examination by the Chief, Audit Division.
3. This is a technical issue."

Cross-examination of Matthews at the trial of the present case elicited the information that Matthews had had some discussions with Internal Revenue Service officials concerning these loans prior to the time he reported the bribery scheme to them. From this the jury might have inferred that he was in some difficulty with the Service in regard to the tax implications of the loans. However, even assuming that Matthews had some knowledge of the fraud referral and its rejection, of which the jury should have been apprised, the incident could show only that Matthews' position with regard to potential criminal liability was, at the time he came forward with the story of the bribery scheme, not so bad as the evidence already before the jury would indicate. The situation is thus quite different from that presented in United States v. Persico, 305 F.2d 534, 537–540 (2d Cir. 1962, where this court held that the trial court erred in excluding cumulative evidence of a witness' criminal history, on the ground that the worse the witness' history, the more likely it was that he faced heavy sentences and thus the greater his motive to aid the government in return for leniency. Since here the evidence of the fraud referral and its rejection would have shown only that Matthews' potential liabilities were not quite so serious as might otherwise have been inferred from the evidence already before the jury, we do not believe appellant was substantially prejudiced by the exclusion of the documents relating to the incident.

The second series of events relates to fraudulent financial statements prepared by Matthews. Between June 28, 1966 and February 27, 1967, Matthews appeared before Revenue Officer Batt and prepared under oath four financial statements. These statements reported total assets ranging from $400 to $1100, but omitted reference to a house in Pelham Manor which Matthews had bought in 1964 and in which he had a $12,000 equity and to a $19,000 life insurance policy with a cash surrender value of $1764.19. On March 3, 1967, Batt, having discovered Matthews' ownership of the house, the insurance policy and another matter not specified, prepared another "Referral Report of Potential Fraud Case," based on the omissions from the four financial statements. This referral was rejected on March 16, 1967 by the Intelligence Division which ruled that there was no criminal potential because there was no indication that the omission of the real estate was intentional, the insurance policy did not appear to be owned by Matthews according to insurance company records and the referring officer had stated that the taxpayer orally disclosed the omission of the real estate prior to the referral date.[8]

The perjured financial statements were admitted into evidence at the trial, and the fact that they omitted any reference to the equity in the Pelham Manor real estate was brought out on both direct and cross examination of Matthews. Matthews also testified that although he had not yet been indicted for perjury as a result of these omissions, he expected that he would be. There is no indication in the excluded files that Matthews knew of the fraud referral report and its rejection. Therefore, the jury was cognizant of all the facts relating to the Service's handling of the perjured financial statements of which Matthews himself was aware. It was in possession of all information concerning the Service's actions with regard to the perjured financial statements which was

8. According to the files, Batt's last meeting with Matthews before making out the fraud referral report was on February 27, 1967, when Matthews prepared the fourth of the perjured financial statements. Batt's notes reveal only that Matthews "Stated he did not own property." From the contrary statement by the Intelligence Division in rejecting the fraud referral one might infer that the Service had some other unexpressed reasons for rejecting the referral, but its motives are of course irrelevant on the issue of Matthews' motives and bias.

relevant to a determination of the effect of this incident on Matthews' motives and bias as a witness. See United States v. Mahler, 363 F.2d 673, 677 (2d Cir. 1966); United States v. Battaglia, 394 F.2d 304, 314–316 (7th Cir. 1968), cert. granted and case remanded, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969), for further proceedings in conformity with Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

The third series of events revealed by the files relates to the repeated postponement of the target date on the penalty assessment account. On October 25, 1966 a "committee report" on the penalty assessment account recommended that after completion of a few additional credit checks, the account should be 53'd on account of "Hardship." A target date of January 30, 1967 was established. However, after Revenue Officer Batt discovered Matthews' ownership of the Pelham Manor house in late January of 1967, he proposed that a new target date of May 31, 1967 be established. This new date was approved by the supervisory committee and by the Collection Manager. On March 7, 1967, the penalty assessment account was apparently reassigned to Revenue Officer A. F. Kuzniewski, and on March 28, 1967, Matthews appeared and was directed to produce a buyer for the house or it would be seized and sold. However, on May 29, 1967, Revenue Officer Kuzniewski, noting that "The corporate accounts and other individual accounts are now under investigation by the Inspection Service," proposed that a new target date of October 31, 1967 be set. This new target date was approved. On October 9, 1967, Kuzniewski again recommended an extension of the target date —to March 31, 1968—noting "Case is still under investigation action is temporarily suspended—pending disposition of

any criminal aspects in the case"; again the proposed new date was approved. On April 23, 1968, the supervisory committee, upon Kuzniewski's recommendation, approved a further extension of the target date to October 31, 1968, and the last entry on the daily history record of the account, made on March 14, 1969, one month before trial, indicates that collection attempts were still being made.

These repeated postponements would seem to represent no more than routine determinations to continue collection attempts rather than close the account. Each extension was made upon the recommendation of the revenue officer then in charge of collection, and the actions of these officers so far as they are revealed by the files show no other purpose than to enforce collection. However, even assuming that Matthews had some knowledge of these postponements and that they affected his motives and bias as a witness, testimony given by Supervisory Revenue Officer Edwin A. Gildt and by Matthews on cross-examination had already established that from January 1, 1963 until the time of trial, the government had collected only $160 on Matthews' personal tax liability and only $1100.96 on his wife's personal liability, although the delinquent taxes for which they remained liable amounted to several hundred thousand dollars. Appellant's counsel had ample opportunity to cross-examine Matthews with these facts in mind in order to bring out further considerations relevant to his motives and bias as a witness.[9]

We believe that the jury in this case was sufficiently apprised of the facts surrounding the government's delay in taking final action on Matthews' tax liabilities to enable them to form a conclusion as to the effect of this on Matthews' motives and bias as a witness.

9. We note that although the government had made available as a witness Revenue Officer Batt, who was in charge of the penalty assessment account for much of the time covered by the excluded documents and who had testified at the earlier trial of the Kamerman co-defendants, he was not called as a witness by the defense.

We therefore conclude that the trial judge did not commit substantial error in excluding the history file on the penalty assessment account.

## II.

Appellant's other contentions may be disposed of briefly.

One of the two indictments charged appellant with aiding and abetting a revenue officer in the unlawful receipt of a fee for the performance of his official duties, in violation of 26 U.S.C. § 7214 (1964) and 18 U.S.C. § 2 (1964). Since the indictment, which was filed on February 19, 1969, charged that the offense was committed "in or about April or May 1963," prosecution of appellant would be barred if a five year statute of limitations were applicable but not if the applicable limitation was six years.

Appellant contends that since he was indicted as an aider and abettor, the period of limitation properly applicable to his offense is the general five year period specified in 18 U.S.C. § 3282 (1964) and not the six year period of limitation made applicable by 26 U.S.C. § 6531(7) (1964) to offenses committed by revenue officers and agents in violation of 26 U.S.C. § 7214(a) (1964). Appellant argues that 26 U.S.C. §§ 7214(a) and 6531(7) apply only to the revenue officers and agents themselves and that he was properly indicted only under 18 U.S.C. § 2.

■ We cannot agree. 18 U.S.C. § 2 does not define a crime; rather it makes punishable as a principal one who aids or abets the commission of a substantive crime. There can be no violation of 18 U.S.C. § 2 alone; an indictment under that section must be accompanied by an indictment for a substantive offense. Nor is there any merit in appellant's contention that 26 U.S.C. §§ 7214(a) and 6531(7) apply only to revenue officers and agents and that one cannot violate Section 7214(a) as an aider and abettor. What legislative history there is supports the contrary position; the House and Senate Reports and the Conference Report relating to the enactment of Section 6531(7) state that the six-year period of limitation is applicable to certain "offenses." See 1954 U.S. Code Cong. & Admin. News, pp. 4564, 5236–37 and 5341. Clearly one can violate Section 7214(a) as an aider and abettor, and the offense, not the persons involved, determines the applicability of the six-year period of limitation.

■ Appellant also contends that the admission into evidence of a tape recording made by Matthews of a conversation he had with appellant violated appellant's Fourth Amendment rights. Reliance is placed on Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967). *Katz* held inadmissible evidence obtained through electronic surveillance of a telephone booth without a warrant and without the knowledge or consent of any party to the conversation overheard. This court has held that where one party to a conversation consents to its being recorded, *Katz* does not apply; it has refused to follow a decision to the contrary in United States v. White, 405 F.2d 838 (7th Cir.), cert. granted 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969). United States v. Polansky, 418 F.2d 444 (2d Cir. 1969); United States v. Kaufer, 406 F.2d 550 (2d Cir.), aff'd, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969), on the basis of Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969). Appellant does not strongly press the issue on appeal; the point is raised in order to preserve it pending the outcome of the *White* case, on which the Supreme Court has already heard argument. See 38 U.S.L.W. 3184 (U.S. November 10, 1969) (No. 46). Pending a decision in *White*, we adhere to our former holdings.

Affirmed.

FRIENDLY, Circuit Judge (dissenting):

Our reports record countless instances where a man has been convicted principally upon the testimony of another at least as guilty, who has received a light

sentence, has remained unsentenced or, as in this case, has not even been indicted. In all likelihood there is no viable alternative to such prosecutorial discretion, although the contrary has been strongly argued. See Davis, Discretionary Justice, Ch. 7 (1969). However, when the prosecution proceeds in this manner, the defendant must be given full opportunity to bring out just what favors the witness has already received from the government and what further ones he may be expecting. The defendant is not limited to cross-examination in attempting to elicit this information and is neither required to accept the witness' statement of ignorance of how kind the government had been to him nor bound to submit other direct evidence of knowledge. Proof of what the government has done may convince the jury that the witness must have known of it, thereby casting him as a liar in his denial as well. This is the wise teaching of such cases as Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953); United States v. Lester, 248 F.2d 329, 332–335 (2 Cir. 1957); and United States v. Masino, 275 F.2d 129, 133 (2 Cir. 1960).

The material in the IRS file would have permitted the jury to conclude they had not heard by any means the full story of the government's dealings with Matthews and of what he knew them to be. First of all, there is the fact that in the very next month after he had gone with his story to the IRS Inspection Service, the IRS reversed its prior decision and decided to "53" the penalty assessment on the ground of "hardship." The jury could have concluded that this was no mere coincidence and that Matthews knew it. Second, while Matthews admitted the omission of his house in Pelham Manor from the financial statements he had furnished the Service and claimed he expected to be indicted for this perjury, the jury might have regarded the episode as considerably more sinister had it known the full facts in the IRS file. Agent Batt had made a Potential Fraud Referral Report on March 3,

1967, and, reporting on the conference at which Matthews supplied his fourth perjurious statement on February 27, 1967, noted "Stated he did not own property." Yet on March 16 the Intelligence Division rejected the referral, saying among other things that there was no indication that the omission of the real estate, which constituted well over 90% of Matthews' assets, was intentional! Surely a jury might rationally infer that this surprisingly favorable action of the Service had been brought to Matthews' attention and that he had every reason to expect that, with continued cooperation on his part, he would *not* be indicted for perjury. Finally, there was a record of unusual leniency with respect to the Pelham Manor house. On March 28, 1967, Matthews was directed to produce a buyer by May 31, 1967, otherwise the house would be seized and sold. On May 29, the target date was adjourned to October 31, 1967, because "The corporate accounts and other individual accounts are now under investigation by the Inspection Service," the division to which Matthews had gone with the story of the bribery in September 1966. On October 9, 1967, a new plan of action was adopted, "Case is still under investigation action is temporarily suspended— pending disposition of any criminal aspects in the case," and the target date was adjourned to March 31, 1968. Possible criminal charges *against Matthews* would afford no reason for not realizing on a salable house for part of the large amounts owed, especially since the Matthews's did not live in the house. The jury could infer that the "criminal aspects" were those concerning Campbell and that Matthews knew he was receiving consideration with respect to the house because of his expected testimony in the instant case.

Beyond all this is the point that what we have here is not a case where the trial judge exercised his discretion after reviewing the documents but one where he declined even to examine them once defense counsel had conceded that the file did not "contain Matthews' signa-

ture asking for this treatment and promising to cooperate if he received it" or "show that these decisions were arrived at after a conference with Matthews." Despite counsel's concessions his offer of proof sufficiently demonstrated the relevancy of the files, and he was entitled to admission at least of the parts I have summarized unless the trial judge, in the exercise of his discretion, determined to exclude them as unduly time consuming even under the stringent standards of Gordon v. United States, *supra*, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447. I do not believe that, applying the proper legal standard, he would—or even could—have done so.

It may well be that giving the defense the fullest latitude with respect to the IRS file would not have helped Campbell; indeed I doubt that it would. But an occasional reversal may be the only means to ensure the defense full opportunity to bring out the interest of an accomplice and convince the prosecution that no efforts should be made to obstruct this.