UNITED STATES, Appellee,

v.

**Mushtaq MALIK, a/k/a Mushtaq Ahmed, Defendant, Appellant.**

No. 90–1549.

United States Court of Appeals, First Circuit.

Heard Jan. 9, 1991.

Decided March 18, 1991.

**18**

Dana Alan Curhan, Boston, Mass., by Appointment of the Court, for defendant, appellant.

Kevin O'Regan, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief, Boston, Mass., for appellee.

Before BREYER, Chief Judge, ALDRICH and TORRUELLA, Circuit Judges.

BREYER, Chief Judge.

Mushtaq Malik appeals his convictions for conspiring to import, and importing, heroin. 21 U.S.C. §§ 952(a), 963; 18 U.S.C. § 2. He makes several evidence-related claims, the most important of which concerns limitations the trial judge imposed on Malik's counsel's efforts to impeach a key witness through cross-examination about the witness's past activities involving the Palestine Liberation Organization, the Jordanian government, and the FBI. After reading the entire record, we conclude that all Malik's claims are without legal merit, and we affirm the convictions.

## I.

### Facts

The government's evidence consisted primarily of taped phone conversations between Malik and Malik's coconspirator Samir Houchaimi, the testimony of Samir Houchaimi, and the testimony of Drug Enforcement Administration Agent William Powers. On the basis of those tapes and

that testimony, a jury might reasonably have found facts such as the following:

In late 1986 or early 1987 Malik and Samir Houchaimi met in Karachi, Pakistan, and discussed heroin trading. In September 1987 they agreed upon a heroin smuggling scheme: Malik was to advance the necessary money and to make eight kilograms of heroin available in Cyprus; Houchaimi was to smuggle the heroin into the United States and sell it. Soon thereafter Malik telephoned his source in Northern Pakistan (named Zahir Shah), identified himself as the "Black Prince," and ordered eight kilograms of heroin. Houchaimi went to Northern Pakistan, met Shah, paid him $6000 and took the heroin (in suitcases with false sides) to Malik's house in Karachi. Malik then had it transferred to the nearby house of his associates, Kassim and Muneera Ghaffar. Muneera Ghaffar then brought seven kilograms of the heroin to Cyprus where she gave it to Houchaimi, who had come to Cyprus separately.

On January 24, 1988, Houchaimi flew to the United States with 2.2 kilograms of heroin hidden in his luggage. He smuggled the heroin through customs in New York, flew on to Chicago, returned the next day to New York, and spent the next two weeks trying to sell the heroin. Eventually, he phoned a man he had met in prison who agreed to buy the heroin and asked Houchaimi to come to Springfield, Massachusetts, to deliver it. On February 6, 1988 Houchaimi went to Springfield, where he was arrested with the 2.2 kilograms of heroin. Houchaimi then confessed all and agreed to co-operate with the government.

At the government's request Houchaimi repeatedly phoned Malik and tried to lure him into meeting with Drug Enforcement Administration Agent Powers who, pretending to be an underworld figure called "Costa," supposedly would pay for Houchaimi's heroin and offer to buy more. The highly incriminating taped phone calls reveal Malik, for example, complaining about Houchaimi's tardiness in paying for the 2.2 kilograms of heroin (Malik said Shah was pressuring him for money), speaking at length about large heroin and hashish shipments (apparently using codewords such as "jackets" to refer to the shipments), and asking Houchaimi to explain his arrest (which Houchaimi said concerned only minor immigration offenses). Malik refused to travel to the United States or to Europe, but he agreed to meet "Costa" in Rio de Janeiro.

Malik met with "Costa" (Agent Powers) and "Costa's bodyguard" (another agent) in Rio on March 29, 1988. "Costa" showed Malik $200,000 in cash. Malik told "Costa" he was the "Black Prince," he talked to "Costa" about the heroin in Cyprus, and he discussed plans for future shipments. After the meeting ended, Brazilian police arrested Malik and sent him to the United States for trial.

## II.

### *Limitations on Cross–Examination*

■ Malik argues that the district court should not have limited his counsel's cross-examination of the government's two key witnesses (Houchaimi and Powers) by forbidding him to ask them about Houchaimi's terrorist activities and related affiliations with the Palestine Liberation Organization and other organizations. He says that the limitation prevented him from developing the theory of his defense. That theory explained his conduct and the tape recordings by arguing that he and Houchaimi were members of a group trying to overthrow the President of Pakistan, that Houchaimi had run off with $500,000 of the group's money, and that he (Malik) was simply playing along with Houchaimi, pretending to agree with his remarks about drug smuggling and bragging in front of "Costa" (following to a script supplied by Houchaimi's son), all in order to get back the group's money and to further the revolutionary plot. Malik adds that the line of questioning would also have helped impeach Houchaimi.

■ The legal question is whether or not the trial judge exceeded his powers to limit cross-examination in order to avoid prejudice, confusion, and unnecessary waste of time. A trial judge has "wide latitude" to

impose such limits. *See United States v. Twomey*, 806 F.2d 1136, 1139 (1st Cir.1986) ("a trial judge retains wide latitude to impose reasonable limits [on cross-examination] in order to avoid prejudice to a party or confusion of the issues") (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)). But, those limits must be reasonable, which is to say that they must not prevent the defendant from providing the jury with essential information about key events and sufficient information to make a "discriminating appraisal" of a witness's motives and possible bias. *See id.* at 1140 (stating that a trial judge's imposition of restrictions will be reversed "only if the jury is left without 'sufficient information concerning formative events to make a "discriminating appraisal" of a witness's motives and bias' ") (quoting *United States v. Campbell*, 426 F.2d 547, 550 (2d Cir.1970)).

Our reading of the record convinces us that the district court, in this case, acted well within the scope of its lawful powers, for the following reasons. First, in context, at the point Malik's counsel tried to pursue the cross-examination in question, its relevance was not clear. After the event, and particularly in his brief in this court, counsel has argued that Malik's story amounted to a claim that he was *playing along* with Houchaimi and that he really did not intend to smuggle drugs. At the time of cross-examination, however, and in his offer of proof, he had not developed the theory very clearly. Indeed, he seemed to be saying either that Malik wanted to show that he had *engaged in drug smuggling* in order to get back the money that Houchaimi allegedly took from the revolutionary group, or perhaps that Houchaimi was lying to get revenge on Malik for reasons arising from some past association.

Counsel's offer of proof consisted of the following:

MR. FERRARONE [Malik's counsel]: ... My defense is going to be, while my client was in prison, [Houchaimi] made many many representations to him that he would involve himself in the attempt to kill Zia ul Haq, and that is the reason why my client became involved with this man, because my client was particularly interested in that and produced a large amount of money from many people in order to see this particular thing.

That is why I need to involve myself in this PLO business and I am not fishing, Your Honor. I have an actual theory of defense that I need to present and that what happened was he took the money from a lot of people and he used it on drugs, and my client, realizing that he had been involved with this person, thought that the only way he was going to receive any money back and being able to repay the sixteen people who were involved in this thing, was to do anything he could to get the money back.

This is the theory in a nutshell, and if I don't get the opportunity to cross examine him on this, I will never be able to adequately present this defense.

Tr. Vol. III, p. 75. The trial court's response to this offer indicates that the court understood this story merely as a recital of events leading up to the conspiracy to import heroin, rather than a version of events under which Malik never formed an intention to conspire to import heroin. The court stated:

Why don't you simply ask him one point blank question, as a result of previous relations with Mr. Malik did he attempt to get involved in this particular conspiracy.

*Id.* If this was a misimpression, counsel for Malik made no attempt to correct it; instead, after one more attempt to ask Houchaimi about a conspiracy to harm Zia ul Haq, to which an objection was sustained, he asked the following question:

As a result of your previous relations with Mr. Malik did you attempt to get him involved in a conspiracy to bring heroin into the United States so that, if caught, you could seek revenge against him for any previous relationships you may have had with him in the past?

Tr. Vol. III, p. 76. Houchaimi answered "Sir, Your Honor, I swear to God that my relationship with Mr. Malik was pure heroin and that is it." *Id.* The cross-examina-

tion then went on to other, unrelated matters.

Not only did counsel for Malik not make clear during his cross-examination of Houchaimi that Malik's defense would be that he never intended to smuggle drugs, he did not make it clear later in the trial either. During Malik's presentation of evidence, counsel continued to argue that Malik's defense was that he had smuggled drugs in order to recover the stolen money. He told the jury, for example:

> So that in a nutshell is what Mr. Malik's testimony is going to be about. He is not going to argue to you, ladies and gentlemen, that at some point he didn't—at some point—at any point he never knew there was—that Mr. Colonel Houchaimi was involved in trafficking drugs. Because he did know that, and he's going to say he did know that. But he is going to tell you that he had an absolute necessity, he had absolute justification that he had to seize this opportunity, because this was going to be his one and only opportunity to get out of that country, and to attempt to at least recover some of the enormous funds that they had given to the Pakistan—that they had given to Colonel Houchaimi to effect the job that Colonel Houchaimi had promised to do.

Tr. Vol. IV, p. 74. Moreover, Malik testified as follows:

> Q. At any point while you were in prison with him, did you have a discussion with Mr. Houchaimi regarding the transportation of heroin to the United States for sale?
>
> A. Absolutely not. We don't believe in this thing. We don't believe in heroin because we don't like it. And we don't do it.
>
> Q. But sir, you will admit that you were involved in dealing with heroin in the course of this transaction; is that correct?
>
> A. It didn't leave me any choice. It was a matter of life and death. It was a matter of life and death of those political people. They were being involved because of my poor judgment. And I had

no other choice except to talk to get in touch with him.

Tr. Vol. IV, pp. 118–19. Finally, counsel, in his closing statement, added:

> MR. FERRARONE: Finally I just ask you to take a look at the testimony of Mr. Malik himself. You heard him tell me to sit down. No, no, I will explain. . . .
>
> And he addressed you frontly and he said this is why I did it. This is why I did it. I was pressed from both sides. I was pressed by Colonel—pressed by General Zia, and I was pressed by my own people. I had given Colonel Houchaimi half a million dollars to do a job, a political job. That you and I know quite well Colonel Houchaimi is undoubtedly capable of doing.

Tr. Vol. VI, p. 135. Since "motive"—at least a "recovery-of-stolen-funds motive"—is not ordinarily a defense to a drug-smuggling charge, and since counsel did not clearly explain any more direct connection, we believe the district court could reasonably have considered that the proposed line of questioning lacked significant probative value for the defense.

Second, the trial court could reasonably have thought that the added impeachment value of the "terrorist" organization membership questions was small. Malik's counsel had already elicited from Houchaimi the facts that he had often smuggled heroin into the United States; that he had previously been arrested and convicted and obtained a significantly reduced sentence in return for co-operating with the government; that the government had promised him significant leniency in return for his co-operation in the present case; and that he had used aliases and false passports. The defense had caught him lying about a phone call from Chicago to New York; and it showed him to be highly evasive about remembering extensive foreign travel all documented in his passport. As we have noted, the court permitted counsel to ask Houchaimi if he had tried to involve Malik in drug smuggling to "seek revenge" for a "previous relationship," which Houchaimi denied. The court might reasonably con-

clude that, say, PLO membership was not obvious proof of significantly worse character or willingness to lie.

Third, at the same time, the court might reasonably conclude that questions about membership in the PLO or other revolutionary groups would introduce a potentially prejudicial, emotional issue into the trial that could distract the jury from the evidence and facts directly related to guilt or innocence of the crime with which Malik was charged.

These three sets of considerations, taken together, lead us to conclude that the trial court's refusal to permit Malik to cross-examine on this issue did not violate Malik's constitutional right to confront witnesses, nor did it exceed the scope of a trial court's lawful trial-management powers. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant").

### III.

### *Other Issues*

■ 1. After Malik testified, the government called back Agent Powers, who said, among other things, that Malik (during the Rio meeting) had told him the following story about his (Malik's) previous involvement in a heroin-smuggling scheme with two men named Reaz Rage and Ahmed Abass:

> ... Mr. Rage double-crossed Mr. Malik and Mr. Abass and sold the heroin without their knowledge to a foreign buyer, then told them that the heroin had been seized by the Pakistani authorities.

> However, Mr. Malik found out about this, and he and Mr. Abass decided that Mr. Rage should be killed. And Mr. Abass in fact asked Mr. Malik if he could have permission to kill Mr. Rage. As a result of that, with Mr. Malik's permis-

sion, according to Mr. Malik, Mr. Abass went to the hotel that Mr. Rage was staying and attempted to enter the room. But was not let in. He then fired, using a rifle, fired shots through the door, severely wounded Mr. Rage.

> When Mr. Malik found out about this and found out Mr. Rage had not died as a result of the attack, he immediately contacted an associate of his in the military, and got Mr. Rage to a military hospital so that he couldn't be interviewed by the local authorities. And when Mr. Rage recovered, he advised Mr. Rage that if he ever returned to Pakistan, he would have Mr. Abass finish the job.

Tr. Vol. VI, pp. 6–7. Malik argues that the government used this "admission" to Powers to show that he (Malik) had previously participated in a bad act, which in turn helped to show his bad character; and that Fed.R.Evid. 404(b) forbids the government's introduction of evidence for this purpose.

■ The short conclusive answer to this claim is that Rule 404(b) forbids the introduction of evidence that is "relevant *only* because it shows bad character;" it permits the introduction of evidence that shows bad character when a party introduces that evidence for other, legitimate reasons. *United States v. Ferrer-Cruz,* 899 F.2d 135, 137 (1st Cir.1990) (citing numerous cases). Here, the government introduced the evidence for a legitimate purpose. Malik had testified that he was a kind of "freedom fighter" who had not previously smuggled heroin. He specifically testified, "We don't believe in heroin because we don't like it. And we don't do it." Tr. Vol. IV, p. 119. Malik's statement to Powers is inconsistent with his previous testimony; it amounts to a "prior inconsistent statement," admissible for impeachment purposes. *See United States v. Barrett,* 539 F.2d 244, 254 (1st Cir.1976) ("To be received as a prior inconsistent statement, the contradiction need not be 'in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the

witness whom it is sought to contradict.'") (quoting *Commonwealth v. West*, 312 Mass. 438, 440, 45 N.E.2d 260, 262 (1942)). Therefore, it overcomes the hurdle of Fed. R.Evid. 404(b). Moreover, the inconsistency was an important one in the context of the trial, for it showed that Malik had told Powers a story close to the polar opposite of his trial testimony; and, for that reason, we believe the trial court could reasonably conclude that the statement's "probative value" outweighed its potential "prejudicial effect." *See United States v. Griffin*, 818 F.2d 97, 101 (1st Cir.) (an appellate court will reverse a trial court's Rule 403 determination only in "exceptional circumstances"), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987).

■ Finally, as Malik now points out, he was entitled to a limiting instruction, making clear how the jury should use the testimony. However, Malik did not ask for such an instruction. Counsel might well have concluded that, in the context of the trial, such an instruction would not prove very helpful. In any event, whether a party wishes such an instruction, or wishes to forego the instruction (thereby calling less attention to the statement) is primarily a matter for counsel to decide at trial. And, we do not find the circumstances here so special that the court's failure to provide such an instruction *sua sponte* amounted to "plain error." The circumstances present in the two cases cited by Malik were quite different. *See United States v. DeGeratto*, 876 F.2d 576, 584 (7th Cir.1989) (suggesting in dictum that even had certain evidence been admissible under Rule 404(b), the trial court's failure to give a limiting instruction would have been plain error); *Dawson v. Cowan*, 531 F.2d 1374, 1377 (6th Cir.1976) (finding plain error in the failure to give a limiting instruction regarding evidence of a prior conviction for attempted rape where the defendant was facing both a principal charge of attempted rape and a habitual offender charge).

■ 2. During the Rio meeting (a tape recording of which the government played for the jury) Powers said to Malik: "Your friend says you are the Black Prince." Malik said he was. The government then asked Powers (testifying live before the jury) what he understood the "Black Prince" to be. Over objection the district court ruled that Powers "may testify what he believes it to be." And, Powers said "I believe the black prince to be a very famous heroin smuggler." Tr. Vol. III, p. 144.

Malik argues that Powers's answer is inadmissible hearsay, for it is not based on Powers's previous personal acquaintance with a famous drug smuggler named the Black Prince, but reflects only what other persons told Powers out of court about the activities of someone called the Black Prince. However, the conclusive answer to this claim is that the court did not admit the statement for its truth (i.e. that Malik *was* the drug smuggler called the Black Prince). Rather, the court admitted the statement in order to show what Powers understood the words "black prince" to mean, as Malik used them. In other words, the statement was admitted to throw light on Powers's *state of mind* when Malik asserted that he was the Black Prince. *See, e.g., United States v. DeVincent*, 632 F.2d 147, 151 (1st Cir.) (holding that certain out-of-court statements were not hearsay because they were admissible "for their effect on the hearer"), *cert. denied*, 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980); J. Weinstein & M. Berger, 4 *Weinstein's Evidence* ¶ 801(c)(1), at 801–94 to 801–96 (1990) (utterances offered to show effect on state of mind are not hearsay).

Nor did the district court have to suppress Powers's answer under Fed.R.Evid. 403. Powers's state of mind was relevant because the jury could not fully understand the conversation at the Rio meeting without knowing that Powers wanted to apprehend a heroin smuggler believed to be calling himself the Black Prince, and therefore wanted to see whether Malik identified himself by that name. Nor could it fully appreciate Powers's subsequent statements and actions during the conversation without knowing that, once Malik had identified himself as the Black Prince, Powers believed himself to be dealing with a "very

famous heroin smuggler." Of course, Malik's counsel could have cross-examined Powers at trial about his understanding of the meaning of those words. Given this legitimate use of the evidence, the court could reasonably have concluded that the probative value of the evidence outweighed any prejudicial effect. *See, e.g., United States v. Simon*, 842 F.2d 552, 555 (1st Cir.1988) (district courts have "considerable leeway" in conducting Rule 403 balancing).

■ 3. Malik also objects to the district court's having permitted the following questions and answers during the government's cross-examination of Malik.

Q. In 1982, sir, a conference of law enforcement officers was held in Wiesbaden, Germany, and the subject of that meeting was your narcotics trafficking; isn't that right?

MR. FERRARONE: Objection, Your Honor.

THE WITNESS: Please. Let him. Please, sit down. He's in dark, doesn't know. I want to help this gentleman. Repeat your question, sir.

[Question repeated.]

A. I'm not a reporter that I should know, that I had to cover that conference. I'm not in the government to cover.

. . . .

Q. Wasn't it true, sir, you bragged to a member of British Customs Service that two hours later, you knew everything that was said in that conference?

A. I think it's baseless. You are trying to put me on the spot.

Tr. Vol. V., p. 159–60 (brackets in original). Malik says that the references to the Wiesbaden conference, tending to show that Malik is a famous heroin smuggler, were prejudicial or otherwise improper.

The short answer to Malik's claim is that no one objected to the question about Wiesbaden (as repeated); and, given Malik's own instruction to his counsel, the trial court could reasonably conclude that counsel did not intend to object. In any event, the questions were proper (assuming that the government had good reason to believe that the facts the questions assumed were

true, *see, e.g., United States v. Silverstein*, 737 F.2d 864, 868 (10th Cir.1984)). Malik's reaction to news of the conference—bragging about his knowledge—is inconsistent with the normal reaction of a person who had never been involved in heroin smuggling, as he had previously testified. It was therefore admissible to impeach him. *See* p. 22, *supra.* The information about the nature of the conference is needed to explain the question and to show why the bragging reaction is inconsistent with his previous testimony. Whether or not the "prejudice" involved outweighs "probative value" under Fed.R.Evid. 403 is, as we have said, a matter primarily for the trial court, not this court; and, given the nature of the defense (the "freedom fighter/no previous connection with heroin" claim), we cannot overturn the district court's judgment in this respect.

For these reasons the judgment of the district court is

*Affirmed.*